GEORGIA *v.* RACHEL ET AL.

No. 147.  Argued April 25–26, 1966.—Decided June 20, 1966.

*George K. McPherson, Jr.,* and *J. Robert Sparks,*
Assistant Solicitors General of Georgia, argued the cause

for petitioner. With them on the brief were *Arthur K. Bolton*, Attorney General, and *Lewis R. Slaton, Jr.*, Solicitor General.

*Anthony G. Amsterdam* argued the cause for respondents. With him on the brief were *Donald L. Hollowell, Jack Greenberg* and *James M. Nabrit III.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This case presents questions concerning the scope of a century-old federal law that permits a defendant in state court proceedings to transfer his case to a federal trial court under certain conditions. That law, now 28 U. S. C. § 1443 (1964 ed.), provides:

"§ 1443. *Civil rights cases.*

"Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

"(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

"(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law."

The case arises from a removal petition filed by Thomas Rachel and 19 other defendants seeking to transfer to the United States District Court for the Northern District of Georgia criminal trespass prosecutions pending against them in the Superior Court of Fulton County, Georgia. The petition stated that the

defendants had been arrested on various dates in the spring of 1963 when they sought to obtain service at privately owned restaurants open to the general public in Atlanta, Georgia. The defendants alleged:

> "their arrests were effected for the sole purpose of aiding, abetting, and perpetuating customs, and usages which have deep historical and psychological roots in the mores and attitudes which exist within the City of Atlanta with respect to serving and seating members of the Negro race in such places of public accommodation and convenience upon a racially discriminatory basis and upon terms and conditions not imposed upon members of the so-called white or Caucasian race. Members of the so-called white or Caucasian race are similarly treated and discriminated against when accompanied by members of the Negro race."

Each defendant, according to the petition, was then indicted under the Georgia statute making it a misdemeanor to refuse to leave the premises of another when requested to do so by the owner or the person in charge.[1] On these allegations, the defendants maintained that removal was authorized under both subsections of 28 U. S. C. § 1443. The defendants maintained broadly that they were entitled to removal under the First Amendment and the Due Process Clause of the Four-

---

[1] The statute under which the defendants were charged, Ga. Code Ann. § 26–3005 (1965 Cum. Supp.), provides:

*"Refusal to leave premises of another when ordered to do so by owner or person in charge.* It shall be unlawful for any person, who is on the premises of another, to refuse and fail to leave said premises when requested to do so by the owner or any person in charge of said premises or the agent or employee of such owner or such person in charge. Any person violating the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished as for a misdemeanor."

teenth Amendment. Specifically invoking the language of subsection (1), the "denied or cannot enforce" clause, their petition stated:

> "petitioners are denied and/or cannot enforce in the Courts of the State of Georgia rights under the Constitution and Laws of the United States providing for the equal rights of citizens of the United States . . . in that, among other things, the State of Georgia by statute, custom, usage, and practice supports and maintains a policy of racial discrimination."

Invoking the language of subsection (2), the "color of authority" clause, the petition stated:

> "petitioners are being prosecuted for acts done under color of authority derived from the constitution and laws of the United States and for refusing to do an act which was, and is, inconsistent with the Constitution and Laws of the United States."

On its own motion and without a hearing, the Federal District Court remanded the cases to the Superior Court of Fulton County, Georgia, finding that the petition did not allege facts sufficient to sustain removal under the federal statute. The defendants appealed to the Court of Appeals for the Fifth Circuit.[2]

---

[2] We reject the State's contention that the appeal was untimely. The notice of appeal was filed 16 days after the order of remand. Although Rule 37 (a) (2) of the Federal Rules of Criminal Procedure requires that an appeal be taken within 10 days after entry of the order appealed from, that rule does not govern an appeal taken prior to verdict, finding of guilty or not guilty by the court, or plea of guilty. This Court promulgated Rules 32–39 under authority of the Act of February 24, 1933, which authorized only rules governing proceedings in criminal cases after verdict, finding of guilty or not guilty by the court, or plea of guilty. 47 Stat. 904, as amended, 18 U. S. C. § 3772 (1964 ed.). See 327 U. S. 825. In 1940, Congress authorized the Court to prescribe rules for criminal proceedings prior to verdict, finding of guilty or not guilty by the court, or plea of

While the case was pending in that court, two events of critical significance took place. The first of these was the enactment into law by the United States Congress of the Civil Rights Act of 1964, 78 Stat. 241. The second was the decision of this Court in *Hamm* v. *City of Rock Hill,* 379 U. S. 306. That case held that the Act precludes state trespass prosecutions for peaceful attempts to be served upon an equal basis in establishments covered by the Act, even though the prosecutions were instituted prior to the Act's passage.[3] In view of these intervening developments in the law, the Court of Appeals reversed the District Court. In terms of the language of § 1443 (1), the court held that, if the allegations in the petition were true, prosecution in the courts of Georgia under that State's trespass statute, substantially similar to the state statutes involved in *Hamm,* denied the defendants a right under a law providing for equal civil rights—the Civil Rights Act of 1964. The case was therefore returned to the District Court, with directions that the defendants be given an opportunity to prove that their prosecutions had resulted from orders to leave places of public accommodation "for racial reasons." Upon such proof, the court held that *Hamm* would then require the District Court to order dismissal of the prosecutions. 342 F. 2d 336, 343.

We granted certiorari to consider the applicability of the removal statute to the circumstances of this case. 382 U. S. 808. No issues touching the constitutional

---

guilty. 54 Stat. 688, as amended, 18 U. S. C. § 3771 (1964 ed.). But this authorization required that the rules be submitted to Congress before they could take effect. Only Rules 1–31 and 40–60 were so submitted. 327 U. S. 824.

[3] "The Supremacy Clause, Art. VI, cl. 2, requires this result where 'there is a clear collision' between state and federal law . . . " *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 311.

power of Congress are involved. We deal only with questions of statutory construction.[4]

The present statute is a direct descendant of a provision enacted as part of the Civil Rights Act of 1866. 14 Stat. 27. The subsection that is now § 1443 (1) was before this Court in a series of decisions beginning with *Strauder* v. *West Virginia,* 100 U. S. 303, and *Virginia* v. *Rives,* 100 U. S. 313, in 1880 and ending with *Kentucky* v. *Powers,* 201 U. S. 1, in 1906.[5] The Court has not considered the removal statute since then, one reason being that an order remanding a case sought to be removed under § 1443 was not appealable after the year 1887.[6] In § 901 of the Civil Rights Act of 1964, however, Congress specifically provided for appeals from remand orders in § 1443 cases, so as to give the federal reviewing courts

---

[4] For a remarkably original and comprehensive discussion of the issues presented in this case and in *City of Greenwood* v. *Peacock, post,* p. 808, see Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U. Pa. L. Rev. 793 (1965).

[5] The intervening cases were: *Neal* v. *Delaware,* 103 U. S. 370; *Bush* v. *Kentucky,* 107 U. S. 110; *Gibson* v. *Mississippi,* 162 U. S. 565; *Smith* v. *Mississippi,* 162 U. S. 592; *Murray* v. *Louisiana,* 163 U. S. 101; *Williams* v. *Mississippi,* 170 U. S. 213. See also *Dubuclet* v. *Louisiana,* 103 U. S. 550; *Schmidt* v. *Cobb,* 119 U. S. 286.

[6] Prior to 1875, a remand order was regarded as a nonfinal order reviewable by mandamus, but not by appeal. *Railroad Co.* v. *Wiswall,* 23 Wall. 507. In 1875, Congress provided for review "by the Supreme Court on writ of error or appeal, as the case may be." 18 Stat. 472. Twelve years later, however, Congress closed off the appellate avenue in the following language: "and no appeal or writ of error from the decision of the circuit court so remanding such cause shall be allowed." 24 Stat. 553. Compare *Gay* v. *Ruff,* 292 U. S. 25, 28–31. In the case of *In re Pennsylvania Co.,* 137 U. S. 451, this Court held that the 1887 statute was also intended to bar review by mandamus. Until its amendment in 1964, the modern version of the statutory bar, 28 U. S. C. § 1447 (d) (1964 ed.), prohibited review of a remand order "on appeal or otherwise" in cases removed pursuant to any statute.

a new opportunity to consider the meaning and scope of the removal statute.[7]  78 Stat. 266, 28 U. S. C. § 1447 (d) (1964 ed.).  The courts of appeals in four circuits have

---

[7] Section 901 of the Civil Rights Act of 1964 established an exception to the nonreviewability rule of 28 U. S. C. § 1447 (d) for cases removed pursuant to 28 U. S. C. § 1443, by making remand orders in these cases "reviewable by appeal or otherwise." 28 U. S. C. § 1447 (d) (1964 ed.).  We have no doubt that Congress thereby intended to open the way for immediate appeal.  See the remarks of: Representative Kastenmeier, 110 Cong. Rec. 2770; Senator Humphrey, 110 Cong. Rec. 6551; Senator Kuchel, 110 Cong. Rec. 6564; Senator Dodd, 110 Cong. Rec. 6955–6956.

Mr. Kastenmeier had originally introduced a bill amending § 1443 itself, which he described as making it "easier to remove a case from a State court to a U. S. district court, whenever it appears that strict impartiality is not possible in the State court." 109 Cong. Rec. 13126, 13128.  In later defending the final bill which simply made remand orders appealable in § 1443 cases, he said on the House floor: "Mr. Chairman, what we have done is probably the most modest thing possible in this field.  The subcommittee had before it a slightly more ambitious section dealing with this problem, and would have amended 1443 and 1447, but the committee took the most conservative approach and provided merely for an appeal of the remand decision." 110 Cong. Rec. 2773.

The statements of the leaders speaking for the bill on the floor of the Senate are typified by the following remarks of Senator Dodd:

"Some have thought that it would be better for Congress to specify directly the kinds of cases which it thinks ought to be removable, rather than simply permitting appeals and allowing the courts to consider the statute again in light of the original intention of the Congress in 1866.  It seems to me, however, that the course we have chosen is more appropriate, considering the rather technical nature of the statute with which we are dealing.

"It would be extremely difficult to specify with precision the kinds of cases which ought to be removable under section 1443.  This is true because of the many and varied circumstances which can and do arise in civil rights matters.  Accordingly, it seems advisable to allow the courts to deal case by case with situations as they arise, and to fashion the remedy so as to harmonize it with the other statutory remedies made available for denials of equal civil rights." 110 Cong. Rec. 6956.

now had occasion to give extensive consideration to various aspects of the removal statute.[8]  In the case before us, the Court of Appeals for the Fifth Circuit dealt only with issues arising under the first subsection of § 1443, and we confine our review to those issues.

Section 1443 (1) entitles the defendants to remove these prosecutions to the federal court only if they meet both requirements of that subsection.  They must show both that the right upon which they rely is a "right under any law providing for . . . equal civil rights," and that they are "denied or cannot enforce" that right in the courts of Georgia.

The statutory phrase "any law providing for . . . equal civil rights" did not appear in the original removal provision in the Civil Rights Act of 1866.  That provision allowed removal only in cases involving the express statutory rights of racial equality guaranteed in the Act itself.  The first section of the 1866 Act secured for all citizens the "same" rights as were "enjoyed by white citizens" in a variety of fundamental areas.[9]  Section 3,

---

[8] In addition to this case and *City of Greenwood* v. *Peacock, post,* p. 808, from the Fifth Circuit, see *Baines* v. *City of Danville,* 357 F. 2d 756 (C. A. 4th Cir.); *City of Chester* v. *Anderson,* 347 F. 2d 823 (C. A. 3d Cir.); *New York* v. *Galamison,* 342 F. 2d 255 (C. A. 2d Cir.).

The statistics on the number of criminal cases of all kinds removed from state to federal courts in recent years are revealing.  For the fiscal years 1962, 1963, 1964, and 1965, there were 18, 14, 43, and 1,192 such cases, respectively.  Of the total removed criminal cases for 1965, 1,079 were in the Fifth Circuit.  See Annual Report of the Director of the Administrative Office of the United States Courts 213–217 (1965).

[9] Section 1 of the Civil Rights Act of 1866 provided in relevant part:

"[A]ll . . . citizens of the United States . . . of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full

the removal section of the 1866 Act, provided for removal by "persons who are denied or cannot enforce . . . the rights secured to them by the first section of this act . . . ." [10]

The present language "any law providing for . . . equal civil rights" first appeared in § 641 of the Revised Statutes of 1874.[11] When the Revised Statutes were compiled, the substantive and removal provisions of the Civil Rights Act of 1866 were carried forward in separate sections.[12] Hence, Congress could no longer identify the rights for which removal was available by using the language of the original Civil Rights Act— "rights secured to them by the first section of this act." The new language it chose, however, does not suggest that it intended to limit the scope of removal to rights recognized in statutes existing in 1874. On the contrary, Congress' choice of the open-ended phrase "any law providing for . . . equal civil rights" was clearly appropriate to permit removal in cases involving "a right under" both existing and future statutes that provided for equal civil rights.

There is no substantial indication, however, that the general language of § 641 of the Revised Statutes was intended to expand the kinds of "law" to which the removal section referred. In spite of the potential breadth of the phrase "any law providing for . . . equal civil

---

and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." 14 Stat. 27.

[10] The relevant provisions of § 3 of the Civil Rights Act of 1866, 14 Stat. 27, are included in the Appendix to this opinion.

[11] The relevant provisions of § 641 of the Revised Statutes of 1874 are included in the Appendix to this opinion.

[12] The guarantees of § 1 of the Civil Rights Act of 1866 were carried forward as §§ 1977 and 1978 of the Revised Statutes, now 42 U. S. C. §§ 1981 and 1982 (1964 ed.).

rights," it seems clear that in enacting § 641, Congress intended in that phrase only to include laws comparable in nature to the Civil Rights Act of 1866. Prior to the 1874 revision, Congress had not significantly enlarged the opportunity for removal available to private persons beyond the relatively narrow category of rights specified in the 1866 Act, even though the Fourteenth and Fifteenth Amendments had been adopted and Congress had broadly implemented them in other major civil rights legislation.[13] Moreover, § 641 contained an explicit cross-reference at the end of the section to § 1977 of the Revised Statutes, which carried forward the principal rights created in § 1 of the 1866 Act. In addition, the note in the margin of § 641 pointed specifically to the removal provision of the Civil Rights Act of 1866 and to §§ 16 and 18 of the Civil Rights Act of 1870.[14] The latter sec-

---

[13] See, e. g., second Civil Rights Act, Act of May 31, 1870, 16 Stat. 140, as amended by Act of February 28, 1871, 16 Stat. 433; third Civil Rights Act, Act of April 20, 1871, 17 Stat. 13. Section 1 of the Civil Rights Act of 1871, now 42 U. S. C. § 1983 (1964 ed.), established civil remedies for "the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States." When in 1874 the revisers relocated § 1 of the 1871 Act as § 1979 of the Revised Statutes, they expanded the section to include the deprivation of rights, privileges, and immunities secured by the "Constitution and laws" of the United States, in contrast to their reference merely to "law" in § 641 of the Revised Statutes, the civil rights removal provision. At least in some circumstances, therefore, it appears that the Revised Statutes may have specifically distinguished between "rights secured by the Constitution" and "rights secured by any law providing for equal civil rights." See also Revised Statutes § 629, Sixteenth (1874), which drew an explicit distinction between rights secured by the Constitution and rights secured by the laws of the United States. The marginal note to the latter section refers to "rights secured by the Constitution and laws" of the United States.

[14] See Slaughter-House Cases, 16 Wall. 36, 83, 96–97 (dissenting opinion of Field, J.).

tions were concerned solely with the re-enactment, in somewhat expanded form, of the 1866 Act. Finally, the limitation of § 641 to laws comparable to the Civil Rights Act of 1866 comports with the relatively narrow mandate of the revising commissioners "to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature, which shall be in force at the time such commissioners may make the final report of their doings." Act of June 27, 1866, c. 140, 14 Stat. 74. We conclude, therefore, that the model for the phrase "any law providing for . . . equal civil rights" in § 641 was the Civil Rights Act of 1866.

The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality. As originally proposed in the Senate, § 1 of the bill that became the 1866 Act did not contain the phrase "as is enjoyed by white citizens."[15] That phrase was later added in committee in the House, apparently to emphasize the racial character of the rights being protected. More important, the Senate bill did contain a general provision forbidding "discrimination in civil rights or immunities," preceding the specific enumeration of rights to be included in § 1.[16] Objections were raised in the legislative debates to the breadth of the rights of racial equality that might be encompassed by a prohibition so general as one against "discrimination in civil rights or immunities." There was sharp controversy in the Senate,[17] but the bill passed. After similar controversy in the House,[18]

---

[15] Cong. Globe, 39th Cong., 1st Sess., p. 474.

[16] Ibid.

[17] See, e. g., id., at 476–477 (remarks of Senator Saulsbury); 505–506 (remarks of Senator Johnson).

[18] See, e. g., id., at 1121–1122 (remarks of Representative Rogers); 1157 (remarks of Representative Thornton); 1271–1272 (remarks of Representative Bingham).

however, an amendment was accepted striking the phrase from the bill.[19]

On the basis of the historical material that is available, we conclude that the phrase "any law providing for . . . equal civil rights" must be construed to mean any law providing for specific civil rights stated in terms of racial equality. Thus, the defendants' broad contentions under the First Amendment and the Due Process Clause of the Fourteenth Amendment cannot support a valid claim for removal under § 1443, because the guarantees of those clauses are phrased in terms of general application available to all persons or citizens, rather than in the specific language of racial equality that § 1443 demands. As the Court of Appeals for the Second Circuit has concluded, § 1443 "applies only to rights that are granted in terms of equality and not to the whole gamut of constitutional rights . . . ." "When the removal statute speaks of 'any law providing for equal rights,' it refers to those laws that are couched in terms of equality, such as the historic and the recent equal rights statutes, as distinguished from laws, of which the due process clause and 42 U. S. C. § 1983 are sufficient examples, that confer equal rights in the sense, vital to our way of life, of bestowing them upon all." *New York* v. *Galamison,* 342 F. 2d 255, 269, 271. See also *Gibson* v. *Mississippi,* 162 U. S. 565, 585–586; *Kentucky* v. *Powers,* 201 U. S. 1, 39–40; *City of Greenwood* v. *Peacock, post,* p. 825.

But the defendants in the present case did not rely solely on these broad constitutional claims in their removal petition. They also made allegations calling into play the Civil Rights Act of 1964. That Act is clearly a law conferring a specific right of racial equality, for in

---

[19] See Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1, 11–29 (1955).

§ 201 (a) it guarantees to all the "full and equal enjoyment" of the facilities of any place of public accommodation without discrimination on the ground of race.[20] By that language the Act plainly qualifies as a "law providing for . . . equal civil rights" within the meaning of 28 U. S. C. § 1443 (1).

Moreover, it is clear that the right relied upon as the basis for removal is a "right under" a law providing for equal civil rights. The removal petition may fairly be read to allege that the defendants will be brought to trial solely as the result of peaceful attempts to obtain service at places of public accommodation.[21] The Civil Rights Act of 1964 endows the defendants with a right not to be prosecuted for such conduct. As noted, § 201 (a) guarantees to the defendants the equal access they sought. Section 203 then provides that, "No person shall . . . (c) punish or *attempt to punish* any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202." (Emphasis supplied.) 78 Stat. 244. In *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 311, the Court held that this section of the Act "prohibits prosecution of any person for seeking service in a covered establishment, because of his race

---

[20] Section 201 (a) provides:

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

[21] Section 1446 of Title 28 requires that a removal petition contain "a short and plain statement of the facts" that purportedly justify removal. The instant petition satisfies that requirement. Since the petition predated the enactment of the Public Accommodations Title of the Civil Rights Act of 1964, it could not have explicitly alleged coverage under that Act. It recites facts, however, that invoke application of that Act on appeal. See *United States* v. *Schooner Peggy,* 1 Cranch 103; *Hamm* v. *City of Rock Hill,* 379 U. S. 306; *Linkletter* v. *Walker,* 381 U. S. 618, 627.

or color." Hence, if the facts alleged in the petition are true, the defendants not only are immune from conviction under the Georgia trespass statute, but they have a "right under" the Civil Rights Act of 1964 not even to be brought to trial on these charges in the Georgia courts.

The question remaining, then, is whether within the meaning of § 1443 (1), the defendants are "denied or cannot enforce" that right "in the courts of" Georgia. That question can be answered only after consideration of the legislative and judicial history of this requirement.

When Congress adopted the first civil rights removal provisions in § 3 of the Civil Rights Act of 1866, it incorporated by reference the procedures for removal established in § 5 of the Habeas Corpus Suspension Act of 1863, 12 Stat. 756. The latter section, in turn, permitted removal either at the pre-trial stage of the proceedings in the state court or after final judgment in that court.[22] There can be no doubt that post-judgment removal was a practical remedy for civil rights defendants invoking either the "denied or cannot enforce" clause or the "color of authority" clause of the 1866 removal provision, in order to vindicate rights that had actually been denied at the trial.[23] The scope of pre-trial removal, however, was unclear.[24]

---

[22] The relevant provisions of § 5 of the Habeas Corpus Suspension Act of 1863, 12 Stat. 756, are included in the Appendix to this opinion. Section 5 of the 1863 Act was amended in certain respects by the Act of May 11, 1866, 14 Stat. 46.

[23] The "color of authority" clause of the Civil Rights Act of 1866 was limited to federal officers and those assisting them. See *City of Greenwood* v. *Peacock, post,* pp. 814–824. In addition, federal officers might also invoke the "denied or cannot enforce" clause.

[24] In view of the large numbers of federal officers and agents potentially involved in enforcement activities under the Civil Rights Act of 1866, see *City of Greenwood* v. *Peacock, post,* pp. 816–820, pre-trial removal would have been of obvious utility under the "color of authority" clause of § 3 of the Civil Rights Act of 1866. Cf. *Tennessee* v. *Davis,* 100 U. S. 257, 261–262 (removal under § 643 of

Congress eliminated post-judgment removal when it enacted § 641 of the Revised Statutes of 1874.[25] The compilation of the Revised Statutes coincided with the

the Revised Statutes of 1874); *Hodgson* v. *Millward,* 12 Fed. Cas. 285 (No. 6568 (C. C. E. D. Pa.)) (removal under § 5 of the Habeas Corpus Suspension Act of 1863, 12 Stat. 756), approved in *Braun* v. *Sauerwein,* 10 Wall. 218, 224. No such obvious role for pre-trial removal is evident under the "denied or cannot enforce" clause.

The obscure legislative history of § 3 of the Civil Rights Act of 1866 indicates only that the Reconstruction Congress did not intend the language of the "denied or cannot enforce" clause of § 3 to be read to its fullest possible extent. In his veto message accompanying the bill President Johnson construed the clause so broadly as to give the federal courts jurisdiction over all cases affecting a person who was denied any of the various rights conferred by § 1, whether or not the right in question was in issue in the particular case. For example, in the President's view, a state court defendant under indictment for murder, who happened to be denied a contractual right under § 1, would be able to remove his case for trial in the federal court. In urging passage of the bill over the President's veto, Senator Trumbull, the floor manager of the bill, rejected the President's construction of the "denied or cannot enforce" clause:

"The President objects to the third section of the bill . . . . [H]e insists [that it] gives jurisdiction to all cases affecting persons discriminated against, as provided in the first and second sections of the bill; and by a strained construction the President seeks to divest State courts, not 'only of jurisdiction of the particular case where a party is discriminated against, but of all cases affecting him or which might affect him. This is not the meaning of the section. I have already shown, in commenting on the second section of the bill, that no person is liable to its penalties except the one who does an act which is made penal; that is, deprives another of some right that he is entitled to, or subjects him to some punishment that he ought not to bear.

"So in reference to this third section, the jurisdiction is given to the Federal courts of a case affecting the person that is discriminated against. Now, he is not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a Legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict

end of the Reconstruction period. During Reconstruction itself, removal under § 3 of the Civil Rights Act of 1866 had been but one measure established by Congress for the enforcement of the numerous statutory rights created under the Civil War Amendments. In other enactments, Congress had taken relatively more drastic steps to enforce those rights.[26] But by the end of the

---

with a statute of the United States; and it is not to be presumed that any judge of a State court would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court—or, if undertaking to enforce his right in a State court he was denied that right, then he could go into the Federal court; but it by no means follows that every person would have a right in the first instance to go to the Federal court because there was on the statute-book of the State a law discriminating against him, the presumption being that the judge of the court, when he came to act upon the case, would, in obedience to the paramount law of the United States, hold the State statute to be invalid." Cong. Globe, 39th Cong., 1st Sess., p. 1759.

Cf. *Blyew* v. *United States*, 13 Wall. 581. It is clear that Senator Trumbull's reference to a person "discriminated against" was a reference to a person who is denied his rights under the bill within the meaning of the "denied or cannot enforce" clause of § 3. See Cong. Globe, 39th Cong., 1st Sess., p. 475.

[25] In 1870, this Court invalidated under the Seventh Amendment post-judgment removal with respect to civil cases tried by a jury. *The Justices* v. *Murray*, 9 Wall. 274. See also *McKee* v. *Rains*, 10 Wall. 22.

[26] See, *e. g.*, § 14 of the amendatory Freedmen's Bureau Act of July 16, 1866, 14 Stat. 176, which re-enacted, in virtually identical terms for the unreconstructed Southern States, the rights granted in § 1 of the Civil Rights Act of 1866, and provided for the enforcement of those rights under the jurisdiction of military tribunals. See also § 1 of the Reconstruction Act of March 2, 1867, 14 Stat. 428, which divided the rebel States into five military districts and placed them under martial law.

Reconstruction period, many of these measures had expired, and by eliminating post-judgment removal, Congress had substantially truncated the original civil rights removal provision. Pre-trial removal was retained, but the scope of the provision had never been clarified. It was in this historic setting that the Court examined the scope of § 641. In a series of cases commencing with *Strauder* v. *West Virginia, supra,* and *Virginia* v. *Rives, supra,* decided on the same day in the 1879 Term, the Court established a relatively narrow, well-defined area in which pre-trial removal could be sustained under the "denied or cannot enforce" clause of that section.

In *Strauder,* the removal petition of a Negro indicted for murder pointed to a West Virigina statute that permitted only white male persons to serve on a grand or petit jury. Since Negroes were excluded from jury service pursuant to that statute, the defendant claimed that the "probabilities" were great that he would suffer a denial of his right to the "full and equal benefit of all laws and proceedings in the State of West Virginia. . . ." 100 U. S., at 304. The state court denied removal, however, and the defendant was convicted.[27]

---

[27] In 1874, a petition for removal could be filed in the state court in which proceedings were pending. Rev. Stat. § 641. If the state court denied removal, that determination could be preserved for review by this Court on review of the final judgment of conviction. An alternative procedure was also available. A petition could be filed in the federal trial court to which the state court had denied removal. See *Virginia* v. *Rives,* 100 U. S. 313; *Virginia* v. *Paul,* 148 U. S. 107, 116. In 1948, removal procedure was simplified. The petition is now filed in the first instance in the federal court. After notice is given to all adverse parties and a copy of the petition is filed with the state court, removal is effected and state court proceedings cease unless the case is remanded. 28 U. S. C. § 1446 (1964 ed.). See generally, American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts, Tentative Draft No. 4, p. 153 *et seq.* (April 25, 1966).

This Court held that pre-trial removal should have been granted because, in the language of § 641, it appeared even before trial that the defendant would be denied or could not enforce a right secured to him by a "law providing for . . . equal civil rights." The law specifically invoked by the Court was § 1977 of the Revised Statutes, now 42 U. S. C. § 1981. That law, the Court held, conferred upon the defendant the right to have his jurors selected without discrimination on the ground of race. Because of the direct conflict between the West Virginia statute and § 1977, the Court in *Strauder* held that the defendant would be the victim of "a denial by the statute law of the State." 100 U. S., at 312.

In *Virginia* v. *Rives,* however, the defendants could point to no such state statute as the basis for removal. Their petition alleged that strong community racial prejudice existed against them, that the grand and petit jurors summoned to try them were all white, that Negroes had never been allowed to serve on county juries in cases in which a Negro was involved in any way, and that the judge, the prosecutor, and the assistant prosecutor had all rejected their request that Negroes be included in the petit jury. Hence, the defendants maintained, they could not obtain a fair trial in the state court. But the only relevant Virginia statute to which the petition referred imposed jury duty on *all* males within a certain age range. Thus, the law of Virginia did not, on its face, sanction the discrimination of which the defendants complained. This Court held that the petition stated no ground for removal. Critical to its holding was the Court's observation that § 641 of the Revised Statutes authorized only pre-trial removal. The Court concluded:

> "the denial or inability to enforce in the judicial tribunals of a State, rights secured to a defendant by any law providing for . . . equal civil rights . . .

of which sect. 641 speaks, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the State, rather than a denial first made manifest at the trial of the case. In other words, the statute has reference to a legislative denial or an inability resulting from it. Many such cases of denial might have been apprehended, and some existed. Colored men might have been, as they had been, denied a trial by jury. They might have been excluded by law from any jury summoned to try persons of their race, or the law might have denied to them the testimony of colored men in their favor, or process for summoning witnesses. . . . In all such cases a defendant can affirm, on oath, before trial, that he is denied the equal protection of the laws or equality of civil rights. But in the absence of constitutional or legislative impediments he cannot swear before his case comes to trial that his enjoyment of all his civil rights is denied to him. When he has only an apprehension that such rights will be withheld from him when his case shall come to trial, he cannot affirm that they are actually denied, or that he cannot enforce them. Yet such an affirmation is essential to his right to remove his case. By the express requirement of the statute his petition must set forth the facts upon which he bases his claim to have his case removed, and not merely his belief that he cannot enforce his rights at a subsequent stage of the proceedings. The statute was not, therefore, intended as a corrective of errors or wrongs committed by judicial tribunals in the administration of the law at the trial." 100 U. S., at 319–320.

The Court acknowledged that even though Virginia's statute did not authorize discrimination in jury selection,

the officer in charge of the selection might nevertheless bring it about.

"But when a subordinate officer of the State, in violation of State law, undertakes to deprive an accused party of a right which the statute law accords to him, as in the case at bar, it can hardly be said that he is denied, or cannot enforce, 'in the judicial tribunals of the State' the rights which belong to him. In such a case it ought to be presumed the court will redress the wrong." 100 U. S., at 321–322.

The Court distinguished the situation in *Strauder:*

"It is to be observed that [§ 641] gives the right of removal only to a person 'who is denied, or cannot enforce, in *the judicial tribunals of the State* his equal civil rights.' And this is to appear before trial. When a statute of the State denies his right, or interposes a bar to his enforcing it, in the judicial tribunals, the presumption is fair that they will be controlled by it in their decisions; and in such a case a defendant may affirm on oath what is necessary for a removal. Such a case is clearly within the provisions of sect. 641." 100 U. S., at 321. (Emphasis in original.)

*Strauder* and *Rives* thus teach that removal is not warranted by an assertion that a denial of rights of equality may take place and go uncorrected at trial. Removal is warranted only if it can be predicted by reference to a law of general application that the defendant will be denied or cannot enforce the specified federal rights in the state courts. A state statute authorizing the denial affords an ample basis for such a prediction.

The doctrine announced in *Strauder* and *Rives* was amplified in *Neal* v. *Delaware,* 103 U. S. 370, and *Bush* v. *Kentucky,* 107 U. S. 110. In both cases, the Court reversed convictions on the ground that jury selection

had been conducted pursuant to a policy of racial discrimination. Yet in both cases the Court also held that a pre-trial removal petition alleging such discrimination stated no ground for removal. In *Neal* the petition relied upon a Delaware constitutional provision, adopted prior to the advent of the Fourteenth and Fifteenth Amendments, that purportedly sanctioned discriminatory jury selection. But the Delaware court in which the petition had been filed held that the subsequent Amendments rendered the state provision void. Hence, unlike *Strauder,* the *Neal* case involved no law of the State upon which to found a suitable prediction that rights of equality would be denied in the courts of the State. In *Bush,* the petition relied upon a Kentucky jury exclusion statute drawn along racial lines that had been enacted after the adoption of the Fourteenth Amendment. But prior to Bush's trial, the Kentucky Court of Appeals had held, in another case, that the statute was unconstitutional. This Court noted that the judicial declaration was binding upon all inferior Kentucky courts and concluded that, "After that decision, so long as it was unmodified, it could not have been properly said in advance of a trial that the defendant in a criminal prosecution was denied or could not enforce in the judicial tribunals of Kentucky the rights secured to him by any law providing for . . . equal civil rights . . . ." 107 U. S., at 116. In both *Neal* and *Bush,* then, the Court held that in the absence of a presently effective state law authorizing the predicted denial, the state court was the proper forum for the resolution of the claims that rights of equality would be denied, even though, as the Court also held, the state courts had ultimately failed to correct the denials that in fact took place at the defendants' trials in those two cases.

Four subsequent decisions, also involving claims of racial discrimination in jury selection, reiterated the principles announced in *Strauder* and *Rives*, and amplified in *Neal* and *Bush*.[28] The final removal case decided by this Court was *Kentucky* v. *Powers*, 201 U. S. 1. In that case, which involved alleged discrimination on a political basis, the defendant was about to undergo his fourth trial, having been successful on appeal after three prior verdicts of guilty. He could therefore enhance his prediction that rights would be denied by pointing to instances of illegality in the three prior proceedings against him. But the petition for removal resembled those in the cases that followed *Strauder* in that it pointed to no state enactment that authorized the predicted denial. Accordingly, restating the *Strauder-Rives* doctrine, this Court held that no case for removal had been made out.

In the line of cases from *Strauder* to *Powers*, the Court interpreted § 641 of the Revised Statutes of 1874. That statute has come down to us, in modified form, as § 1443. But in its first subsection, the present removal statute still requires that a petitioner be one who "is denied or cannot enforce in the courts of" a State the rights he seeks to vindicate by removing the case to federal court. There is no suggestion that the modifications in the statute since 1874 were intended to effect any change in substance. Hence, for the purposes of the present case, we are dealing with the same statute that confronted the Court in the cases interpreting § 641.[29]

---

[28] *Gibson* v. *Mississippi*, 162 U. S. 565; *Smith* v. *Mississippi*, 162 U. S. 592; *Murray* v. *Louisiana*, 163 U. S. 101; *Williams* v. *Mississippi*, 170 U. S. 213. See also *Dubuclet* v. *Louisiana*, 103 U. S. 550; *Schmidt* v. *Cobb*, 119 U. S. 286.

[29] Since *Kentucky* v. *Powers*, 201 U. S. 1, the federal courts have consistently applied the *Strauder-Rives* doctrine to deny removal in a variety of circumstances. See, *e. g.*, *Kentucky* v. *Wendling*, 182

The *Strauder-Rives* doctrine, as consistently applied in all these cases, required a removal petition to allege, not merely that rights of equality would be denied or could not be enforced, but that the denial would take place in the courts of the State. The doctrine also required that the denial be manifest in a formal expression of state law. This requirement served two ends. It ensured that removal would be available only in cases where the predicted denial appeared with relative clarity prior to trial. It also ensured that the task of prediction would not involve a detailed analysis by a federal judge of the likely disposition of particular federal claims by particular state courts. That task not only would have been difficult, but it also would have involved federal judges in the unseemly process of prejudging their

F. 140 (C. C. W. D. Ky.); *White* v. *Keown*, 261 F. 814 (D. C. D. Mass.); *Ohio* v. *Swift & Co.*, 270 F. 141 (C. A. 6th Cir.); *New Jersey* v. *Weinberger*, 38 F. 2d 298 (D. C. D. N. J.); *Snypp* v. *Ohio*, 70 F. 2d 535 (C. A. 6th Cir.); *Hull* v. *Jackson County Circuit Court*, 138 F. 2d 820 (C. A. 6th Cir.); *Steele* v. *Superior Court*, 164 F. 2d 781 (C. A. 9th Cir.); *Lamson* v. *Superior Court*, 12 F. Supp. 812 (D. C. N. D. Cal.); *California* v. *Lamson*, 12 F. Supp. 813 (D. C. N. D. Cal.); *Washington* v. *American Society of Composers*, 13 F. Supp. 141 (D. C. W. D. Wash.); *Bennett* v. *Roberts*, 31 F. Supp. 825 (D. C. W. D. N. Y.); *North Carolina* v. *Jackson*, 135 F. Supp. 682 (D. C. M. D. N. C.); *Texas* v. *Dorris*, 165 F. Supp. 738 (D. C. S. D. Tex.); *Louisiana* v. *Murphy*, 173 F. Supp. 782 (D. C. W. D. La.); *McDonald* v. *Oregon*, 180 F. Supp. 861 (D. C. D. Ore.); *Hill* v. *Pennsylvania*, 183 F. Supp. 126 (D. C. W. D. Pa.); *Rand* v. *Arkansas*, 191 F. Supp. 20 (D. C. W. D. Ark.); *Petition of Hagewood*, 200 F. Supp. 140 (D. C. E. D. Mich.); *Van Newkirk* v. *District Attorney*, 213 F. Supp. 61 (D. C. E. D. N. Y.); *City of Birmingham* v. *Croskey*, 217 F. Supp. 947 (D. C. N. D. Ala.); *Arkansas* v. *Howard*, 218 F. Supp. 626 (D. C. E. D. Ark.); *Alabama* v. *Robinson*, 220 F. Supp. 293 (D. C. N. D. Ala.); *Levitt & Sons, Inc.* v. *Prince George County Congress of Racial Equality*, 221 F. Supp. 541 (D. C. D. Md.); *Olsen* v. *Doerfler*, 225 F. Supp. 540 (D. C. E. D. Mich.).

brethren of the state courts. Thus, the Court in *Strauder* and *Rives* concluded that a state enactment, discriminatory on its face, so clearly authorized discrimination that it could be taken as a suitable indication that all courts in that State would disregard the federal right of equality with which the state enactment was precisely in conflict.

In *Rives* itself, however, the Court noted that the denial of which the removal provision speaks "is primarily, *if not exclusively,* a denial . . . resulting from the Constitution or laws of the State . . . ." 100 U. S., at 319. (Emphasis supplied.) This statement was reaffirmed in *Gibson* v. *Mississippi,* 162 U. S. 565, 581. The Court thereby gave some indication that removal might be justified, even in the absence of a discriminatory state enactment, if an equivalent basis could be shown for an equally firm prediction that the defendant would be "denied or cannot enforce" the specified federal rights in the state court. Such a basis for prediction exists in the present case.

In the narrow circumstances of this case, *any* proceedings in the courts of the State will constitute a denial of the rights conferred by the Civil Rights Act of 1964, as construed in *Hamm* v. *City of Rock Hill,* if the allegations of the removal petition are true. The removal petition alleges, in effect, that the defendants refused to leave facilities of public accommodation, when ordered to do so solely for racial reasons, and that they are charged under a Georgia trespass statute that makes it a criminal offense to refuse to obey such an order. The Civil Rights Act of 1964, however, as *Hamm* v. *City of Rock Hill,* 379 U. S. 306, made clear, protects those who refuse to obey such an order not only from conviction in state courts, but from *prosecution* in those courts. *Hamm* emphasized the precise terms of § 203 (c) that prohibit any "attempt to punish" persons for exercising rights of equality conferred upon them by the Act. The

explicit terms of that section compelled the conclusion that "nonforcible attempts to gain admittance to or remain in establishments covered by the Act, are immunized from prosecution . . . ." 379 U. S., at 311. The 1964 Act therefore "substitutes a right for a crime." 379 U. S., at 314. Hence, if as alleged in the present removal petition, the defendants were asked to leave solely for racial reasons, then the mere pendency of the prosecutions enables the federal court to make the clear prediction that the defendants will be "denied or cannot enforce in the courts of [the] State" the right to be free of any "attempt to punish" them for protected activity. It is no answer in these circumstances that the defendants might eventually prevail in the state court.[30] The burden of having to defend the prosecutions is itself the denial of a right explicitly conferred by the Civil Rights Act of 1964 as construed in *Hamm* v. *City of Rock Hill, supra.*

Since the Federal District Court remanded the present case without a hearing, the defendants as yet have had no opportunity to establish that they were ordered to leave the restaurant facilities solely for racial reasons. If the Federal District Court finds that allegation true, the defendants' right to removal under § 1443 (1) will be clear.[31] The *Strauder-Rives* doctrine requires no more, for the denial in the courts of the State then clearly appears without any detailed analysis of the likely behavior of any particular state court. Upon such a finding it will be apparent that the conduct of the defend-

---

[30] As pointed out in the separate opinion of Judge Bell in the Court of Appeals for the Fifth Circuit, 342 F. 2d 336, 343, 345, the Supreme Court of Georgia has in at least one case applied the doctrine of *Hamm* v. *City of Rock Hill* to set aside convictions under the state trespass statute. *Bolton* v. *Georgia,* 220 Ga. 632, 140 S. E. 2d 866.

[31] In addition to their racial allegation, the defendants must also show that the restaurant facilities in question were establishments covered by the Civil Rights Act of 1964.

ants is "immunized from prosecution" in any court, and the Federal District Court must then sustain the removal and dismiss the prosecutions.

For these reasons, the judgment is                    *Affirmed.*

[For Appendix to opinion of the Court, see facing page.]

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN and MR. JUSTICE FORTAS join, concurring.

As I indicate in my opinion in the *Peacock* cases, *post,* p. 842, equal civil rights of a citizen of the United States are "denied" within the meaning of 28 U. S. C. § 1443 (1) (1964 ed.) when he is prosecuted for asserting them. Section 201 of the Civil Rights Act of 1964 (78 Stat. 243, 42 U. S. C. § 2000a (1964 ed.)) gave these defendants a right to equal service in places of public accommodation. Section 203 (78 Stat. 244, 42 U. S. C. § 2000a–2 (1964 ed.)) gave them a right against intimidation, coercion, or punishment for exercising those rights. And we held in *Hamm* v. *City of Rock Hill,* 379 U. S. 306, that §§ 201 and 203 precluded state criminal trespass convictions of sit-in demonstrators even though the sit-ins occurred

# APPENDIX TO OPINION OF THE COURT.

## Comparative Table of Civil Rights Removal Legislation.

| Habeas Corpus Suspension Act<br>Act of March 3, 1863, c. 81, § 5, 12 Stat. 756 | Civil Rights Act of 1866<br>Act of April 9, 1866, c. 31, § 3, 14 Stat. 27 | Revised Statutes of 1874<br>§ 641 | Title 28, United States Code<br>§ 1443 (1964 ed.) |
|---|---|---|---|
|  | Sec. 3. *And be it further enacted,* That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; [1] and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever, | Sec. 641. When any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, | § 1443. *Civil rights cases.*<br>Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:<br>(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof; |
| Sec. 5. *And be it further enacted,* That if any suit or prosecution, civil or criminal, has been or shall be commenced in any state court against any officer, civil or military, or against any other person, for any arrest or imprisonment made, or other trespasses or wrongs done or committed, or any act omitted to be done, at any time during the present rebellion, by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any act of Congress, and the defendant shall, at the time of entering his appearance in such court, or if such appearance shall have been entered before the passage of this act, then at the next session of the court in which such suit or prosecution is pending, file a petition, stating the facts and verified by affidavit, for the removal of the cause for trial at the next circuit court of the United States, to be holden in the district where the suit is pending . . . . [T]he cause shall proceed therein in the same manner as if it had been brought in said court by original process . . . . And it shall be lawful in any such action or prosecution which may be now pending, or hereafter commenced, before any state court whatever, for any cause aforesaid, after final judgment, for either party to remove and transfer, by appeal, such case during the session or term of said court at which the same shall have taken place, from such court to the next circuit court of the United States to be held in the district in which such appeal shall be taken . . . . [A]nd it shall also be competent for either party, within six months after the rendition of a judgment in any such cause, by writ of error or other process, to remove the same to the circuit court of the United States of that district in which such judgment shall have been rendered . . . . *Provided* . . . That no such appeal or writ of error shall be allowed in any criminal action or prosecution where final judgment shall have been rendered in favor of the defendant or respondent by the state court. . . . | or against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof, or for refusing to do any act upon the ground that it would be inconsistent with this act, such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the "Act relating to habeas corpus and regulating judicial proceedings in certain cases," approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof. . . . | or against any officer, civil or military, or other person, for any arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid, or for refusing to do any act on the ground that it would be inconsistent with such law, such suit or prosecution may, upon the petition of such defendant, filed in said State court, at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed, for trial, into the next circuit court to be held in the district where it is pending. . . . [2] | (2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law. |

[1] Section 1 of the Civil Rights Act of 1866, 14 Stat. 27, is reproduced in note 9, *supra.*

[2] The provisions of § 641 of the Revised Statutes of 1874 were carried forward as § 31 in the compilation of the Judicial Code of 1911, c. 231, 36 Stat. 1096. Aside from insignificant changes in punctuation, the only alteration introduced in 1911 was the substitution of "district court" for "circuit court" in the section. Section 31 was carried forward without change as § 74 of Title 28 of the United States Code, as codified in 1926. Section 74 became § 1443 in the revision of Title 28 in 1948.

and their prosecution had been instituted prior to the effective date of the 1964 Act.

Congress, in other words, gave these defendants the right to enter the restaurants in question, to sit there, and to be served—a right that was construed by this Court to include immunity from prosecution after the effective date of the Act for acts done prior thereto.

It is the right to equal service in restaurants and the right to be free of prosecution for asserting that right— not the right to have a trespass conviction reversed—that the present prosecutions threaten. It is this right which must be vindicated by complete insulation from the State's criminal process if it is to be wholly vindicated. It is this right which the defendants are "denied" so long as the present prosecutions persist.

Georgia claims that *Hamm* v. *City of Rock Hill, supra,* does not cover cases of sit-ins prosecuted for disorderly conduct or other unlawful acts. Of course that is true. But one of the functions of the hearing on the allegations of the removal petition will be to determine whether the defendants were ejected on racial grounds or for some other, valid, reason. The Court of Appeals correctly ruled that "in the event it is established that the removal of the appellants from the various places of public accommodation was done *for racial reasons,* then under authority of the Hamm case it would become the duty of the district court to order a dismissal of the prosecutions without further proceedings." 342 F. 2d 336, 343. (Emphasis added.)

If service was denied for other reasons, no case for removal has been made out. And if, as is intimated, any doubt remains as to whether the restaurants in question were covered by the 1964 Act, that too should be left open in the hearing to be held before the District Court—a procedure to which the defendants do not object.